## THE ROCKPORT.

## THE PATIENCE.

### STEWART v. THE PATIENCE.
### No. A–17016.

District Court, E. D. New York.
Dec. 6, 1944.

Purdy & Lamb, of New York City. (Thomas J. Irving, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for claimant.

BYERS, District Judge.

The libelant's cause is for damage to the starboard stern quarter cleat of her coal barge Rockport on November 11, 1943, which is claimed to have resulted from negligent maneuvering of the claimant's tug Patience while taking the Rockport in tow at the 96th Street rack in the East River.

The items set forth in the survey of November 22, 1943, are consistent with such damage.

The libel alleges in part:

"Fourth: On or about November 11, 1943, the Rockport was lying securely made fast at the light racks at 96th Street, East River amongst a number of other boats. Approximately at 9:30 P. M. the tug Patience came along to take the Rockport and other boats to place them in a tow. In maneuvering to take the boats out of position, the Patience contacted and pushed upon the boats without releasing the lines,

breaking the Rockport's *bow line and cleat* and doing considerable damage to the Rockport." (Italics supplied.)

Since the Rockport's bow line was never on the starboard stern cleat, and no damage was shown to the bow cleat, it will be seen that the libelant's cause as alleged suffered from congenital confusion from which it never recovered, and from which the testimony of her witnesses afforded no relief.

There is no dispute that the Rockport was the center of three light coal barges lying abreast at the rack and headed upstream.

The Manila (83.2' x 28.5' x 12.2') was moored to the rack by her own lines; next outboard was the Rockport (100' x 24.6' x 12') held to the Manila by two lines leading from the Rockport. Her bargee, Silverose, apparently a West Indian negro, was difficult to understand, because he spoke with a pronounced accent; and more than difficult to follow as a witness, since his version of what happened was incredible in part, and self-contradictory as to one matter at least.

Alongside the Rockport to starboard was the Tracy No. 12 (112.9' x 30' x 14') made fast to the Rockport by two lines leading from the No. 12; her bargee, Collan, seemed to be a well-intentioned person whose memory was not clear on important points.

The time and physical conditions are undisputed, namely:

The maneuvering took place at around 9:00 to 9:30 P. M., and no one mentioned moonlight to dispel the customary darkness of night. A light ebb tide and a moderate offshore wind respectively controlled the tailing of the barges, and affected the conduct of the necessary maneuvers.

The libelant undertook to demonstrate that the Patience came in contact with and pushed upon the three vessels above referred to, breaking the Rockport's bow line and cleat, etc.

There is no testimony of damage to a cleat at the bow of the Rockport.

Silverose, after describing the position of the vessels as above stated, said on direct that there were two or three boats astern of the said tier, while further along (in explaining the handling of the bow line that he had to the Manila and the first maneuver that he attributed to the Patience) he said: "After he takes this boat away, then I put my towing line—there *is no boat astern*—I don't need a dock line." (Italics

supplied.) That observation effectually cancels the first on this subject, and is important in connection with the general handling of these vessels by the Patience.

Collan also said that there were three or four boats astern of his tier.

Eye-witnesses for the claimant, namely, the captain of the Patience and the two deckhands, testified that there were no vessels astern of the Rockport tier, and as Collan's testimony with respect to the first movement by the Patience, namely, that it was down-river and that the Tracy No. 12 was on the tug's starboard side, is inconsistent with the presence of any barges or similar craft astern of the Rockport tier, it is found that in fact there were no vessels in a position which could be described as astern of the tier in question.

All witnesses agree that there was a tier of three or four boats lying ahead, and two of the claimant's witnesses and Collan fix the distance at about twenty feet, and that statement is accepted.

Silverose said that the first thing that the Patience did was to take a boat lying ahead of the Rockport out. There could be no possible reason for such a happening; nor does the libelant's brief so argue.

Then he testified to having made a change in his lines after the Patience is said to have taken that boat out, thus:

"Q. What did you do? A. I put my lines on somebody's boat ahead of me—it was the towing line. .

"Q. You took your tow line and put it on the boat ahead of you? A. Yes, sir.

"Q. And did you take it off the Manila at that time? A. No, sir.

"Q. But you did put another line out to a boat ahead of you? A. Yes, sir. I had the bow line still on the Manila and I take the tow line and I put it on the boat ahead of me and then I have just the stern line."

This witness did not undertake to explain how his barge was put into forward movement against the tide and somewhat against the offshore wind so as to cover the twenty feet or so that separated the Rockport tier from the vessels lying ahead. Moreover there was no reason why the Patience should handle these two light barges separately.

The foregoing testimony is not accepted.

The same witness continued, that after the Patience had taken out one of the boats ahead of him, the tug "stays about ten min-utes and then he comes back again" and laid alongside the Tracy No. 12, that is, on the starboard side, but he cannot remember whether the tug's bow was facing up-river or not. He continued:

"A. Well, he stayed there about ten minutes. He did not do nothing. He stayed there ten minutes and he put the line on the Tracy and he then started to push, push, push, *full speed,* and everybody says, 'Cap, what are you doing?' He don't pay no mind and he started to push and he started to push and *then afterwards, when I go outside,* I see all the cleat and all the deck gone." (Italics supplied.)

So much of the foregoing as attributes full speed ahead to the tug in moving the Tracy No. 12 forward is manifestly incredible; the significant statement that "afterwards when I go outside" is probably true, which means that he was in his cabin at the time that he claims some damage was done, and his later denial that he had so testified, when asked the question again on cross examination, fails to "add verisimilitude, etc."

Continuing with this bargee, he said that, while the tug was in the act of pushing, his bow line was "still on the Manila". He next stated that he put his towing line on the vessel ahead of him.

"Q. And did you still leave the line between your bow and the Manila? A. That's right.

"Q. But you put another line to the boat ahead, your towing line? A. That's right."

The then situation as the witness described it leaves the Manila still moored to the rack and the Rockport held to her, and yet the Rockport has moved ahead twenty feet so as to enable the witness to pass his towing line to the vessel ahead.

He also said, when asked if he had three lines out in all, that such was not the fact; that he had only his stern line out to the Rockport and one to the Manila ahead, "and I had my towing line on somebody's boat ahead of me * * * and then after he came back again, my line parted, that tow line parted and my bow swings".

He continued that thereafter the tug, being alongside the Tracy No. 12, stayed there about ten minutes, "and then he pulled back and forth, back and forth, full speed, back and forth, back and forth". -

Having said that the bow line parted first, he continued:

"Q. Then, what happened to the line that was on the starboard quarter cleat of the Rockport? A. Still held the Tracy line.

"Q. What was the Patience doing at that time? A. He tried to take the Tracy and put him ahead, so that he can take me and put me in a tow.

"Q. He was trying to move the Tracy so that he could take you out? A. Yes, me and the Manila.

"Q. And after your bow line broke, what was the Patience doing? A. After my bow line broke he was still alongside of the Tracy.

"Q. And what was he doing? A. Just pulling back and forth, pulling back and forth, full speed.

\* \* \* \* \* \* \*

"Q. Now, after your bow line parted, what happened next to your boat? A. When the line parted, on the starboard side I see all the deck and the cleats gone. \* \* \* They came out altogether.

"Q. Was that the cleat where the Tracy's line was made fast on the starboard quarter? A. That's right.

"Q. And what did the Patience do after that? A. He pushed the Tracy ahead a little bit so that he could come in and take me.

\* \* \* \* \* \* \*

"Then he takes me and the Manila and puts me in a tow."

On cross examination he said that, when the Patience made fast alongside the Rockport, the tug had no other boat on its starboard side, and that the tow was as made up at 96th Street, and had six, or seven or eight boats.

"Q. And he made up those six boats at 96th Street? A. Yes, sir, at 96th Street he makes up the tow for Port Reading.

"Q. And he put you in this tow and then went back to the rack and got the Manila? A. That's right."

These extended quotations can be justified only for the purpose of demonstrating how impossible it is to rely upon Silverose for a reasonably accurate statement of what the Patience really did.

Libelant says he is no longer in her employ. That is understandable.

The other witness, Collan, the bargee of the Tracy No. 12, is relied upon as to the lines leading from his vessel to the Rockport, namely, from his port bow to the latter's starboard bow, and from his quarter cleat to the quarter cleat on the starboard side of the Rockport. These were 6-inch lines, almost new, and his testimony is preferred to that of the deckhand of the claimant as to the bight in each line being doubled around the Rockport's cleats; he said that the sterns of the two vessels were about flush, and that the bow of the Tracy No. 12 lapped the bow of the Rockport by about six or eight feet. So much is convincing.

He cannot be relied upon as to the maneuvers attributed to the Patience when she arrived alongside of his vessel, because he said she headed down-stream; that would put her starboard side to the starboard side of the Tracy No. 12, and the forward movement that he attributes to her would be toward the vessels which he says lay astern of the tier of the three vessels concerned in this case. It is thought that he is wrong as to the presence of those vessels, and that he is equally wrong as to the Patience's heading down-stream, since the testimony of her master and deckhand is that, when she began this maneuver, she had in tow on her starboard hand a light barge which she had picked up at 74th Street.

Another difficulty with his testimony occurs in connection with his explanation of what happened when his barge was moved ahead by the tug:

"He proceeded to get under way which caused the stern of the No. 12 to surge against the stern of the Rockport, and so forth, into the rack."

Since he says this was undertaken without any orders having been received from the tug as he recalls, it means that without notice the tug took, on one line from the tug to the Tracy No. 12, the three boats in this tier, because they were made fast as has been previously explained. That would have defeated the obvious requirement of moving only the No. 12 ahead, leaving the other barges in a position of accessibility to the tug, to enable it to take them in tow.

His statement of that maneuver is believed to be due to a mistaken memory, but in any case it is not accepted; incidentally it would seem that if the stern of the Tracy No. 12 was forced closer to the stern of the Rockport as he says, the tendency would be to produce slack in the line running from the port side aft of the No. 12 to the Rockport, rather than to put a strain

on it which, had it occurred, might have caused the cleat on the Rockport to be pulled from its anchorage.

Since the testimony of libelant's witnesses cannot be accepted as to the maneuvers of the Patience, it follows that the libelant's cause fails for lack of proof.

For the sake of completeness, it may be added that the evidence adduced by the claimant persuaded the court that what actually happened was that the tug, having a light barge in tow on her starboard side, approached the tier in which the Rockport was moored and made fast either to the Tracy No. 12 or to another barge lying alongside and outboard of the No. 12.

The presence of such a barge at that place has been demonstrated, and even Collan says he may be mistaken in denying it; in any case it is not important. The Patience of course was heading up-stream and not down-stream as Collan says.

The object of making fast to either barge was to shove the two of them ahead to the next tier, where they were held, and then to cause the lines holding the Manila to the rack to be let go with the result that the Manila and the Rockport under the impetus of the offshore wind would sag outboard and toward the Patience, which dropped back so as to be in a position to receive them on her port side; that is what happened, and lines from the Patience were put out to the Rockport, namely, a bow line on her forward cleat starboard side, and a stern line to the stern cleat of the Rockport; the towing strap or line was put on the bow quarter cleat of the Rockport under orders from the captain of the tug, and the tow, consisting of three vessels in all, then proceeded from 96th Street after circling about, to head down the river.

It is unnecessary to discuss the several elements of the testimony which convinced the court that that was what took place, because it is a credible narrative and is consistent with the plain requirements of the situation. It should be said that the Tracy boats, having been moved ahead, were made fast to the tier ahead of that in which the Rockport was a member. The space of twenty feet was of course too short to admit of any of this being done at full speed as Silverose states. The physical conditions dictated that the tow should be made up substantially in accordance with the foregoing recital, and hence it is concluded that such was the actual occurrence.

It should be said that Zibrowski, a deckhand on the Patience of two years' experience, is relied upon as to his statement that he, being on the Tracy No. 12, first let go of her stern line to the Rockport. He then let go the bow line so that the Tracy barges were free to move ahead without dragging the Rockport and the Manila with them.

That the lines were cast loose is also established by Collan, who testified as follows:

"Q. Well, did you take the lines off—what happened to your lines? A. I threw the line clear from the quarter and when the Patience had the Rockport, either me or the deckhand let the bow line go.

"Q. That is the deckhand from the tug? A. Yes.

"Q. And was he on your boat? A. Quite likely he was.

"Q. You don't remember that? A. Well, it is customary."

It is not thought that Zibrowski's testimony is impaired by his statement that, as to each line, the eye was on the Rockport; of course that could have been true, but probably was not; certainly the lines had to be cast loose in order that the Tracy No. 12 should move ahead as has been stated.

Finally, the libelant has offered nothing to explain why the damaged cleat should have pulled out. If it was not sturdy enough to hold a line, assuming that one was placed upon it, under such a restricted movement as this, the claimant's tug cannot be blamed. There is ample in the testimony offered for the Patience to establish that the infirmity of this cleat antedated November 11, 1943, but no finding on that subject is required.

Upon the testimony as a whole, it is concluded that for failure of proof the libel must be dismissed, with costs. Settle decree, and findings if desired.